COURT OF APPEALS OF VIRGINIA

Present:  Judges Petty, Chafin and Senior Judge Frank
Argued at Norfolk, Virginia

PUBLISHED

SANTRAUN DESHAUD SPELLER

                                                    OPINION BY
v.        Record No. 1826-17-1            JUDGE WILLIAM G. PETTY
                                                    NOVEMBER 6, 2018

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Glenn R. Croshaw, Judge

Kristin Paulding (7 Cities Law, on brief), for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


Santraun Deshaud Speller was found guilty of two counts of burglary, two counts of

conspiracy to commit burglary, and two counts of grand larceny of a firearm.  On appeal, Speller

argues that the trial court erred in finding him guilty of conspiracy to commit burglary because

the evidence was insufficient to show that there was an agreement to commit burglary, that the

trial court erred in finding the him guilty of burglary because the evidence was insufficient to

show that he broke into a home or entered a home, and that the trial court erred in finding him

guilty of larceny of a firearm because the evidence was insufficient to show that the items stolen

were firearms.  For the reasons stated below, we disagree and affirm the judgment of the trial

court.

BACKGROUND

"On appeal, we review the evidence in the light most favorable to the Commonwealth,

granting to it all reasonable inferences fairly deducible therefrom."  Wells v. Commonwealth, 65

Va. App. 722, 725, 781 S.E.2d 362, 364 (2016) (quoting Martin v. Commonwealth, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987)).

A witness, N. Cobb,[1] testified that on February 26, 2016, at approximately 12:30 p.m. she was walking home from school. On her way home, she saw three unknown "[b]lack[] African-American" men going into and around the home of a neighbor to her friend, S. Fry. The men were wearing sweatpants and sweatshirts with the hoods up. Cobb saw one of the men knocking on Fry's neighbor's front door while the other two went in the yard between Fry's house and the neighbor's house. Then Cobb saw one of the men carry a "box full of stuff" out from the home of Fry's neighbor, C. Bare, and put it in the trunk of a silver Buick. That man then went back into Bare's house, and Cobb continued walking to her home, which was "[f]our or five houses" down the street. Ten minutes later, Cobb saw the silver Buick drive past her house; she could see two people inside the car.

Fry testified that when Cobb informed her of the suspicious activity by her house, Fry immediately went to her house and saw the silver Buick parked across the street from her house and that of Bare's. Fry took a picture of the Buick's license plate, which was entered into evidence at trial. Fry looked in the silver Buick and saw a black book bag, which she took out and put in her boyfriend's car. Fry then went into Bare's backyard and looked in his kitchen window. Fry saw the "silhouette of a black man . . . standing in the kitchen." Fry ran to her boyfriend's car and watched as "three black males, [] two of them [] carrying rifles," ran to the Buick. Fry described the rifles as "[l]ong," "black" "guns." Fry corroborated Cobb's testimony that the burglars were wearing "grey, black" "sweatshirts and sweatpants" with "their hoods up."

---

[1] To protect the anonymity of the victims and citizen witnesses in this case, we refer to their first name by initials only.

- 2 -

Homeowner Bare testified that when he left for work at 5:00 a.m. on the morning of February 26th, his house was secured. When he returned home after being notified of the burglary, Bare found his home in disarray with his things strewn about the floor, drawers emptied, cabinets gone through, and his side garage door "frame was broken out of the door where the deadbolt and the lock had been secured." Bare noted that he kept a number of shotguns, rifles, pistols, and ammunition in a gun safe, inside his garage. Bare found his gun safe pried open and the guns and ammunition stolen. Additionally, the burglars took Bare's medication, tablets, laptops, and jewelry—including a piece of Pittsburgh Steelers jewelry and other costume jewelry that was found in the silver Buick later that day.

N. Blanco, a homeowner in a nearby neighborhood, testified that he left his home for work on February 26, 2016 at 8:15 a.m. with the doors and windows locked. When Blanco returned home at approximately 6:15 p.m. that night, however, he found his back door "had been kicked open and the deadbolt had pushed it up against . . . the opposite wall." Blanco testified that his house was in disarray. Missing from Blanco's home were at least two bottles of medication and a handgun—a green "Springfield Armory XD .40." Blanco kept the handgun "loaded" and on the top shelf in a closet that had been gone through by the burglars. Blanco explained that he had "fired" the handgun "probably several months before" the burglary—it was "operational" and he had "[n]o problem firing it."

Soon after police were called about the burglary at Bare's home, Officer Kenneth Eavey of the Virginia Beach Police Department saw a silver Buick pass "right in front of [him]" at a stoplight and saw two people in the car who appeared to be black males. He followed the car until it pulled into a residential driveway. Officer Eavey watched three black males wearing "winter type" clothing—"long sleeves" and "a hoodie"—get out of the car. Officer Eavey got out of his car and told the men to "[h]old it." The men glanced in Officer Eavey's direction,

acted as if they were going to the front door, but then "broke and ran straight . . . for the fence." All three men then climbed the six-foot fence, ran through the yard, and climbed over the fence again to leave the property out the back. Before the burglars fled out of sight, however, Officer Eavey was able to see them for ten to fifteen seconds and positively identified Speller as one of the fleeing burglars.

Officer Gregory Blair was in the area and heard Officer Eavey's radio dispatch regarding the three burglary suspects and had been told that citizens in the area had called reporting that they had seen a male running and jumping fences. While searching for the suspects, Officer Blair could hear dogs barking from people's yards, noticed some broken pickets in a fence, looked into the yard, and saw fresh footprints in the wet grass. Officer Blair then saw a black male, Speller, running across the yard wearing only underwear and one sock. Speller was sweating and explained that he was hot and sweaty because he was out jogging. Needless to say, despite Speller's explanation, he was arrested at that time.

A forensic specialist with the Virginia Beach Police Department examined the silver Buick and its contents for fingerprints. In the Buick were several firearms, jewelry, and clothing. He testified that "[t]he Ruger, the double barrel, the black rifle, and the black shotgun . . . were in the backseat of the vehicle." Underneath the driver's seat of the Buick was "a Springfield pistol," which was "loaded." The officer was able to obtain one latent print from the Springfield Armory firearm.[2] That fingerprint was identified as coming from Speller's left ring finger. Additionally, among other items of their property, both Blanco's and Bare's prescription medications were found in the car.

---

[2] Examiners also found latent prints from Speller's codefendants on several items in the silver Buick.

- 4 -

A judge sitting without a jury found Speller guilty of two counts of burglary, two counts of conspiracy to commit a felony, and two counts of larceny of a firearm.

ANALYSIS

Speller challenges the sufficiency of the evidence to support his convictions. When considering the sufficiency of the evidence on appeal, "a reviewing court does not 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" Crowder v. Commonwealth, 41 Va. App. 658, 663, 588 S.E.2d 384, 387 (2003) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). "Viewing the evidence in the light most favorable to the Commonwealth, as we must since it was the prevailing party in the trial court," Riner v. Commonwealth, 268 Va. 296, 330, 601 S.E.2d 555, 574 (2004), "[w]e must instead ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" Crowder, 41 Va. App. at 663, 588 S.E.2d at 387 (quoting Kelly v. Commonwealth, 41 Va. App. 250, 257, 584 S.E.2d 444, 447 (2003) (*en banc*)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. Accordingly, "[t]he judgment of the trial court shall not be set aside unless it appears from the evidence that said judgment is plainly wrong or without evidence to support it." Bright v. Commonwealth, 4 Va. App. 248, 250-51, 356 S.E.2d 443, 444 (1987); see also Code § 8.01-680.

## I. Burglary

Speller argues that the evidence was insufficient to prove that he burglarized either Blanco's or Bare's home because there was insufficient evidence that he broke into or entered the homes. We disagree.

"To sustain a conviction for statutory burglary under Code § 18.2-91, the Commonwealth must prove: (1) the accused . . . broke and entered the dwelling house in the daytime; and (2) the accused entered with the intent to commit any felony other than murder, rape, robbery or arson." Robertson v. Commonwealth, 31 Va. App. 814, 820-21, 525 S.E.2d 640, 644 (2000) (citing Code §§ 18.2-90, 18.2-91). "Breaking, as an element of the crime of burglary, may be either actual or constructive." Davis v. Commonwealth, 132 Va. 521, 523, 110 S.E. 356, 357 (1922).

The evidence presented in this case was sufficient to find Speller guilty of burglary of Bare's home. Bare testified that although his house was locked and secured when he left for work that morning, when he returned home he found his side garage door frame "broken out of the door where the deadbolt and the lock had been secured." An eyewitness saw three men go into and take property out of Bare's house around 12:30 p.m. that afternoon. The witness saw the men put items into the trunk of a silver Buick. After the men brought multiple items out to the car, the witnesses saw them drive away in the silver Buick. Soon after, police found the silver Buick and followed it as it parked in a driveway in a residential area. Three men got out of the silver Buick, and police identified Speller as one of them. When police asked the men to stop, they all fled. As the Supreme Court held in Clagett v. Commonwealth, 252 Va. 79, 93, 472 S.E.2d 263, 271 (1996), "Flight following the commission of a crime is evidence of guilt . . . ." Furthermore, police apprehended Speller soon after in a nearby neighborhood, sweating and wearing only boxer shorts and a single sock. Despite his attire and the February cold, Speller told police he was sweating because he was jogging. In its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt. Speight v. Commonwealth, 4 Va. App. 83, 88, 354 S.E.2d 95, 98 (1987) (*en banc*). Additionally, police found multiple items of Bare's property in the silver Buick, including firearms, ammunition, jewelry, and medication. As this Court held in

Archer v. Commonwealth, 26 Va. App. 1, 13, 492 S.E.2d 826, 832 (1997), "The unexplained possession of recently stolen goods permits the fact finder to infer that the possessor is the thief." Accordingly, it was reasonable for the fact finder to conclude that Speller and his cohorts broke and entered Bare's house in the daytime and entered with the intent to commit larceny.

Furthermore, the evidence presented in this case was sufficient to find Speller guilty of burglary of Blanco's home. Blanco's home was burglarized the same day as Bare's. Blanco testified that when he left for work that morning, his house was locked and secured. When he got home, however, he found his back door "had been kicked open and the deadbolt had pushed it up against . . . the opposite wall." That afternoon, eyewitnesses saw three men go into and take property out of Bare's home, which was in close proximity to Blanco's home. As noted above, the men were seen getting into a silver Buick, driving away, and later pulling into the driveway of a residential address. Three men got out of the car and ran when approached by police. Police identified Speller as one of the men that got out of the Buick and fled. Inside the silver Buick, police found Blanco's property. Among the numerous items of Blanco's property in the car, police found Blanco's Springfield Armory firearm, which had Speller's fingerprint on it. Accordingly, it was reasonable for the fact finder to conclude that Speller and his cohorts broke and entered Blanco's house in the daytime and entered with the intent to commit larceny.

## II. Conspiracy to commit burglary of Blanco's home

Speller also contends that the evidence was insufficient to support his convictions of conspiracy to commit burglary of Blanco's property. He contends that the Commonwealth failed to establish an agreement between Speller and his cohorts to break into Blanco's home. Speller concedes that although the Commonwealth can show that three men entered Bare's home, it cannot show how many men entered Blanco's home. Speller argues that the Commonwealth's

evidence merely proves that Speller got into the silver Buick after the home had been burglarized and must have inadvertently touched Blanco's gun.

"Conspiracy is defined as 'an agreement between two or more persons by some concerted action to commit an offense.'" Wright v. Commonwealth, 224 Va. 502, 505, 297 S.E.2d 711, 713 (1982) (quoting Falden v. Commonwealth, 167 Va. 542, 544, 189 S.E. 326, 327 (1937)). "The Commonwealth may prove the existence of a conspiratorial agreement by circumstantial evidence and need not prove an explicit agreement." Gray v. Commonwealth, 30 Va. App. 725, 736, 519 S.E.2d 825, 830 (1999), aff'd, 260 Va. 675, 537 S.E.2d 862 (2000). Thus, "a conspiracy may be inferred from the overt actions of the parties . . . ." McQuinn v. Commonwealth, 19 Va. App. 418, 425, 451 S.E.2d 704, 708 (1994).

> Where it is shown that the [accused] by their acts pursued the same object, one performing one part and the other performing another part so as to complete it or with a view to its attainment, the jury will be justified in concluding that they were engaged in a conspiracy to effect that object.

Amato v. Commonwealth, 3 Va. App. 544, 552, 352 S.E.2d 4, 9 (1987) (quoting 16 Am. Jur. 2d Conspiracy § 42 (1979)). "[T]he crime of conspiracy is complete when the parties agree to commit an offense." Gray v. Commonwealth, 260 Va. 675, 680, 537 S.E.2d 862, 865 (2000). In Virginia, "[n]o overt act in furtherance of the underlying crime is necessary." Id.

At the outset, it is important to note what Speller has *not* argued on appeal. Speller's assignment of error states that the trial court erred in finding that the evidence was sufficient to find him "guilty of conspiracy to commit burglary." In the body of his petition for appeal and opening brief, however, Speller only addresses the conspiracy charge that relates to Blanco's home. The trial court found Speller guilty of two counts of conspiracy.[3] Therefore, whether the

---

[3] Neither the indictments nor the trial court's final order specify the address or homeowner name for either count of conspiracy.

trial court erred in finding Speller guilty of conspiring to commit burglary of Bare's home is conceded by Speller and is not before us.

Nevertheless, it is reasonable to conclude that because Speller conspired to commit a burglary on Bare's property, he conspired to commit a burglary on Blanco's property. As we noted above, eyewitnesses saw three black men burglarize Bare's home and accordingly conspired to do so. Those men were then found soon after with both Bare's and Blanco's property in their car. Eyewitnesses saw the three men enter Bare's house together, carry out his property, leave together, and then run from police together. Bare's and Blanco's homes were burglarized the same day, and are geographically near each other. The Commonwealth need not present direct evidence of an agreement in order to obtain a conviction for conspiracy. Gray, 30 Va. App. at 736, 519 S.E.2d at 830. The trial court was not plainly wrong in finding that the foregoing was sufficient circumstantial evidence to prove the existence of a conspiratorial agreement between Speller and his cohorts.

### III. Larceny of a firearm

Lastly, Speller argues that the trial court erred in finding that the evidence was sufficient to convict him of two counts of grand larceny of a firearm because the items stolen were not proved to be firearms. Speller argues that the definition of a firearm the Supreme Court has applied to Code § 18.2-308.2, possession of a firearm by a convicted felon, should have been used by the trial court in considering the same term under Code § 18.2-95.[4] Had it done so, Speller continues, the evidence would have been insufficient to establish that the objects stolen were firearms.

---

[4] Although the record is somewhat unclear, the trial court appeared to have rejected that argument by concluding, "I do believe [Code § 18.2-95] is a different code section not governed by that." The court did not articulate what definition of firearm it was applying.

In a sufficiency of the evidence review, we apply the plainly wrong standard outlined above. Statutory interpretation, however, presents a pure question of law and is subject to *de novo* review by this Court. Harvey v. Commonwealth, 65 Va. App. 280, 283, 777 S.E.2d 231, 233 (2015). "We apply the plain meaning of the language appearing in the statute unless it is ambiguous or applying the plain language leads to an absurd result." Id. at 285, 777 S.E.2d at 234 (quoting Commonwealth v. Amos, 287 Va. 301, 305-06, 754 S.E.2d 304, 306-07 (2014)).

### A. What constitutes a firearm under Code § 18.2-95

Speller was convicted of two counts of grand larceny of a firearm, pursuant to Code § 18.2-95. Code § 18.2-95 provides, in pertinent part, "Any person who . . . commits simple larceny not from the person of another of any firearm, regardless of the firearm's value, shall be guilty of grand larceny[.]" "Firearm" in Code § 18.2-95 is not defined within the statute, and there is no Virginia case precedent that defines firearm as it relates to that statute. Thus, before we can determine if the evidence was sufficient to prove a firearm was stolen, we must first consider what constitutes a firearm under the statute.

The Supreme Court in Armstrong v. Commonwealth, 263 Va. 573, 562 S.E.2d 139 (2002), considered a similar question when it was confronted with determining the proper definition of firearm as it relates to Code § 18.2-308.2.[5] To define firearm, the Court "look[ed] to the related statutes, [and] read[] them *in pari materia* with the statute under consideration, in order to give consistent meaning to the language used by the General Assembly." Id. at 583, 562 S.E.2d at 145. We will do the same.

As the Armstrong Court noted, "the conduct proscribed by Code § 18.2-308.2, being a felon in *possession of a firearm*, focuses on the General Assembly's determination that certain

---

[5] Code § 18.2-308.2 states, in relevant part, "It shall be unlawful for [] any person who has been convicted of a felony . . . to knowingly and intentionally possess or transport any firearm."

individuals—felons—are unfit to possess firearms, even for lawful purposes," rather than "criminal conduct that produces fear of physical harm to an individual victim." Id. at 582-83, 562 S.E.2d at 144 (quotation marks omitted). "[A]ccordingly, the offense has no element of perception by a victim that would warrant applying the same broad construction to the term 'firearm' in [Code § 18.2-308.2] as is applicable to the same term in Code § 18.2-53.1." Id. at 583, 562 S.E.2d at 144.[6] Furthermore, the Court noted,

> Code §§ 18.2-308.2:2 and 18.2-308.2:3 define a firearm as "any handgun, shotgun, or rifle which expels a projectile by action of an explosion." Code § 18.2-308(M) defines a "handgun" as an instrument "originally designed, made and intended to fire a projectile by means of an explosion of a combustible material from one or more barrels." Code § 18.2-433.1 defines a "Firearm" as "any weapon which is designed to or may readily be converted to expel any projectile by the action of an explosive; or the frame or receiver of any such weapon." Similar definitions of a firearm or a specific type of firearm may be found, for example, in Code §§ 18.2-287.4, 18.2-308.2:01, 18.2-308.7, and 22.1-277.01(D).

Id. at 583, 562 S.E.2d at 145. Notably, "[n]one of these statutory definitions reflect a legislative intent . . . to limit the term 'firearm' to one that is presently operable." Id. Therefore, "[w]e are of opinion that the General Assembly intended to include any instrument designed, made, and intended to fire or expel a projectile by means of an explosion within the definition of a firearm, absent express language to the contrary." Id. Likewise, Code § 18.2-95 contains no such express language to the contrary.

Furthermore, Code § 18.2-95, like Code § 18.2-308.2, deals with the dangerous nature of the firearm and not the criminal conduct that produces fear of physical harm to an individual victim. By definition, larceny does not require any force, threat or intimidation to a victim.

---

[6] Code § 18.2-53.1 prohibits the use of a firearm in certain felonies. The Supreme Court has determined that it is the victim's perception of the object used that determines whether the object constitutes a firearm. Holloman v. Commonwealth, 221 Va. 196, 198-99, 269 S.E.2d 356, 358 (1980).

Thus, we see no logical reason why the definition of firearm under Code § 18.2-308.2 should not also apply to a prosecution under Code § 18.2-95.

Consequently, we hold that to obtain a conviction for grand larceny of a firearm, when a value of more than $200 is not shown, the Commonwealth must prove that the item stolen was "any instrument designed, made, and intended to fire or expel a projectile by means of an explosion." Id. However, as is the case in prosecutions under Code § 18.2-308.2, proof that the firearm was operable at the time of the theft is not required. Id.

### B. Sufficiency of the evidence that a firearm was stolen[7]

In Jordan v. Commonwealth, 286 Va. 153, 158-59, 747 S.E.2d 799, 801 (2013), the Court affirmed Jordan's conviction under Code § 18.2-308.2 because the circumstantial evidence was sufficient for the jury to conclude that the object Jordan held was a firearm. The victim testified that Jordan pointed "a gun" at his head and told him to get out of the truck he was in. Id. at 155, 747 S.E.2d at 800. The victim also testified that he was familiar with handguns because his father was in the military—he said the object was a small, silver semi-automatic pistol, which he identified as a "'Raven,' a particular type of small pistol with which he was familiar." Id. He explained that if it was a toy gun, it was "[a] really detailed [one]." Id. (alterations in original). Jordan appealed his subsequent conviction because "there was no evidence showing that [he] possessed an actual firearm and not an instrument of similar appearance." Id. at 156, 747 S.E.2d at 800.

In affirming the conviction, the Supreme Court explained that the victim was able to specifically identify the object as a Raven pistol, a weapon designed, made, and intended to fire

---

[7] On brief, Speller argues that the trial court made a factual finding that the Commonwealth had failed to prove the items were firearms when it acquitted him of possession of a firearm by a convicted felon. This finding, he argues, precludes his conviction of larceny of a firearm. Because Speller did not include this argument in an assignment of error, we decline to consider it.

- 12 -

or expel a projectile by means of an explosion. Id. at 158, 747 S.E.2d at 801 ("A Raven is a well-known, compact, .25 caliber semi-automatic pistol that is commonly referred to as a 'Saturday Night Special,' and can easily be concealed. See United States v. Sanders, 994 F.2d 200, 202 (5th Cir. 1993); Burks v. State, 876 S.W.2d 877, 884 (Tex. Crim. App. 1994). The reference to a 'Raven' indicates a specific weapon that was designed, made, and intended to fire or expel a projectile by means of an explosion. A Raven pistol clearly meets the definition of a firearm as set out in Armstrong."). Furthermore, the victim's ability to identify the Raven pistol was subject to cross-examination, and how much weight to give his identification was a matter for the trier of fact. Id. Moreover, Jordan's act of pointing the gun at the victim while directing him to get out of the car "most assuredly communicated the message that if [the victim] did not comply, Jordan would shoot him." Id. See Redd v. Commonwealth, 29 Va. App. 256, 258-60, 511 S.E.2d 436, 437-38 (1999) (holding object proven to be "firearm" when store clerk testified that Redd pointed a "long, black gun" at her and told her she would kill the clerk if the clerk activated the alarm). Accordingly, the law in Virginia, as stated in Redd and supported in Jordan, is that the specific "designed, made, and intended to fire or expel a projectile by means of an explosion" language is not required.

To be sure, the Commonwealth must present sufficient evidence to support a finding that the object was designed, made, and intended to fire or expel a projectile by means of an explosion. But, like our Court in Redd and the Supreme Court in Jordan, we decline to require the Commonwealth to present *specific testimony* that the object was designed, made, and intended to fire or expel a projectile by means of an explosion. Whether the object is a firearm that was designed, made, and intended to fire or expel a projectile by means of an explosion is a question of fact that may be proven by circumstantial evidence. See Redd, 29 Va. App. 256, 511 S.E.2d 436; Jordan, 286 Va. 153, 747 S.E.2d 799.

- 13 -

Applying this standard to the facts in this case, we hold that the circumstantial evidence was sufficient to demonstrate that the instruments taken by Speller were designed, made, and intended to fire or expel a projectile by means of an explosion. Blanco testified that the handgun stolen from him was a "Springfield Armory XD .40," which was loaded with ammunition and kept out of sight on the top shelf of a closet. Furthermore, Blanco testified that he had fired the gun several months before the theft and that the gun was "operational." When asked if he had any problem "firing it," Blanco said, "Not at all."

Furthermore, Bare testified that a number of "shotguns, rifles, pistols," and ammunition were stolen out of the locked gun safe he kept in his garage. Bare testified that the stolen items were: "[t]he Ruger SR45 .45 caliber pistol, semi-automatic, a double barrel shotgun made in Spain, a model A-15 sometimes called an AR-15, Sheridan 5.56/223 semi-automatic rifle, and a–that's from DPMS Oracle makes that model. And the last one is a pistol grip Savage Stevens 12-gauge shotgun."[8] Additionally, except for one bag in the living room, Bare kept the ammunition for these weapons in the safe with the firearms. Common sense dictates that a reasonable fact finder could conclude that the "shotguns, rifles, and pistols" locked in a gun safe along with ammunition were items designed, made, and intended to fire a projectile.

Additionally, as in Jordan, the victims were able to identify the well-known brands and calibers of firearms that were stolen from them. Moreover, unlike Jordan and Redd, the Commonwealth in this case was able to introduce into evidence pictures of the stolen firearms. Upon consideration of all the evidence presented by the Commonwealth, a rational trier of fact could have found that the instruments stolen in this case were firearms designed, made, and intended to fire or expel a projectile by means of an explosion.

---

[8] Fry testified that she saw the burglars carrying "[l]ong," "black" "guns" out of Bare's home and putting them in the Buick.

- 14 -

CONCLUSION

For the foregoing reasons, the decision of the trial court is affirmed.

<u>Affirmed.</u>